CRAIG H. MISSAKIAN (CABN 125202)
United States Attorney

JEFF MITCHELL (CABN 236225)
Chief, Criminal Division

MICHELLE J. KANE (CABN 210579)
Assistant United States Attorney

    1301 Clay Street, Suite 340S
    Oakland, California 94612
    Telephone: (510) 637-3680
    FAX: (510) 637-3724
    michelle.kane3@usdoj.gov

Attorneys for United States of America

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

OAKLAND DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA, | CASE NO. CR 24-566 JST |
| Plaintiff, | UNITED STATES' SENTENCING MEMORANDUM |
| v. | |
| TREVON DEMAR ALLEN | February 27, 2026 |
| Defendant. | 9:45 am |
| | Courtroom 6, 2nd Floor |

**INTRODUCTION**

Pursuant to Criminal Local Rule 32-5(b), the United States respectfully submits this memorandum in order to discuss the applicable Sentencing Guidelines ("Guidelines") calculations and to advise the Court of its sentencing recommendation, taking into account the sentencing factors in 18 U.S.C. § 3553(a). The government recommends that, consistent with the Plea Agreement and the Guidelines, the Court impose a sentence of five months in custody and five months of home confinement, three years of supervised release with the conditions agreed to in the plea agreement and any other conditions recommended by the Probation Officer, restitution, and a $100 special assessment.

//

U.S. SENT. MEMO.
CR 24-566 JST

## FACTUAL AND PROCEDURAL BACKGROUND

As detailed in the Plea Agreement and Presentence Report ("PSR"), defendant Trevon Allen conspired with others to commit "SIM swaps"[1] as part of a larger scheme to compromise victims' online accounts. Co-conspirators used the account access provided through the SIM swaps to enrich themselves by stealing cryptocurrency, obtaining confidential information, and making extortion demands.

On November 7, 2024, a grand jury in this District returned an indictment charging defendant with one count of conspiring to commit aggravated identity theft, traffic in unauthorized access devices, and obtain information through unauthorized access to computers, in violation of 18 U.S.C. § 371. The indictment also named two codefendants as part of the conspiracy. The codefendants were both charged in the indictment with additional counts of aggravated identity theft in violation of 18 U.S.C. § 1028A.

The FBI arrested defendant on November 13, 2024, in Elkhart, Indiana. He made his initial appearance the same day in the Northern District of Indiana, and was released on an unsecured bond. On October 3, 2025, defendant pleaded guilty pursuant to a written agreement to Count One of the indictment. In the agreement, defendant admitted that, beginning in January 2024, he knowingly conspired with his codefendant Indigo Graham and others to commit the violations of 18 U.S.C. § 1028A, 1029(a)(2) and (3), and 1030(a)(2)(C) and (c)(2)(B)(i), (ii) as alleged in the indictment.

Defendant admitted that, as part of the conspiracy, he travelled to retail stores for the purpose of conducting, or attempting to conduct, "SIM swaps" and "ICCID lookups."[2] Defendant agreed that the object of the conspiracy was for the coconspirators to unjustly enrich themselves by targeting victims for SIM swaps, creating fraudulent identification documents in victims' names, performing SIM swaps in exchange for money, fraudulently obtaining two-factor authentication codes, accessing and stealing victims' money and data, and concealing the ill-gotten funds through cryptocurrency transactions. Defendant also admitted that he understood that the purpose of conducting the SIM swaps was to obtain two-factor authentication codes and send them to co-conspirators, knowing knew that the co-

---

[1] A SIM swap refers to the process of fraudulently inducing a carrier to reassign a cell phone number from the legitimate subscriber or user's Subscriber Identity Module ("SIM") card to a SIM card controlled by a criminal actor.

[2] An ICCID lookup involves using a fake ID to fraudulently induce a mobile phone company representative to disclose the Integrated Circuit Card Identifier ("ICCID") number for a victim's account. The ICCID number can then be used as part of a SIM swap.

U.S. SENT. MEMO                                        2
CR 24-566 JST

conspirators would use the authentication codes to access online accounts at various providers without authorization. Defendant knew that the co-conspirators were fraudulently obtaining money through their unauthorized access.

Defendant specifically admitted his role in the SIM swap of victim M.E. as alleged in the indictment. Defendant, along with Graham, entered a Verizon Store in Cincinnati, Ohio, where he presented false identification with his photograph and victim M.E.'s name to a Verizon Store employee. Defendant then fraudulently convinced the Verizon employee to switch M.E.'s cellular telephone account to a physical phone that defendant and Graham possessed, knowing that the purpose of switching the service was to obtain the two-factor authentication codes sent to M.E.'s phone. Defendant understood that the code would be communicated to coconspirators, who would use the codes to access M.E.'s online accounts without authorization. Defendant admitted that he was paid for impersonating M.E.

Defendant agreed that the co-conspirators used security codes obtained through his SIM swap of M.E.'s phone to access computers at Cytek Biosciences, and that Cytek suffered a pecuniary loss of at least $132,000 in response costs as a result. The PSR describes the threats and extortion demands that Cytek faced following the unauthorized access to its computers. PSR ¶¶ 19-20.

As described in the PSR, defendant was involved in other SIM swaps between January and March 2024. PSR ¶ 22. The FBI obtained camera footage showing defendant in five mobile phone stores between January 20, 2024, and February 10, 2024. PSR ¶ 7. Defendant was paid approximately $300 per SIM swap. *Id.*

**SENTENCING GUIDELINES CALCULATIONS**

The Plea Agreement includes the following Guidelines calculations:

| | Count One—18 U.S.C. § 371 | Level/Points |
|---|---|---|
| a. | Base offense level—U.S.S.G. § 2X1.1, 2B1.1(a)(2) | 6 |
| b. | Specific offense characteristics | |
| | Loss more than $95,000—U.S.S.G. § 2B1.1(b)(1)(E) | +8 |

| | | | |
|---|---|---|---|
| c. | Acceptance of responsibility—If I meet the requirements of U.S.S.G. § 3E1.1, I may be entitled to a two-level reduction for acceptance of responsibility, provided that I forthrightly admit my guilt, cooperate with the Court and the Probation Office in any presentence investigation ordered by the Court, and continue to manifest an acceptance of responsibility through and including the time of sentencing. | -2 |
| d. | Adjusted offense level | 12 |

The Probation Officer agrees with the Guidelines calculation in the plea agreement. PSR ¶ 35. The government agrees with the conclusion in the PSR that defendant has one criminal history point and is therefore in Criminal History Category I. PSR ¶¶ 36-42. At an adjusted offense level of 12, combined with Criminal History Category I, the Guidelines provide for a sentence of 10 to 16 months in Zone C of the sentencing table. The minimum term may be satisfied by imprisonment or by a sentence that substitutes community confinement or home detention for half of the minimum term of imprisonment. U.S.S.G. § 5C1.1(d). The maximum statutory term of imprisonment is five years.

**STATUTORY SENTENCING FACTORS**

After considering the Sentencing Guidelines and factors outlined in 18 U.S.C. § 3553(a), the government believes that a sentence of five months of imprisonment and five months of home confinement, the low end of the applicable Guidelines range, is a reasonable and appropriate sentence.

**A. The Nature and Circumstances of the Offense**

The defendant and the others charged in this case provided a crucial service in the online criminal ecosystem. The SIM swaps they committed enabled the conspiracy to monetize identity information. A coconspirator used that identity information to create false identification documents. Other coconspirators used the two factor authentication codes obtained through the SIM swaps to access online accounts. Without defendant and others who could do the "real life" impersonation, however, the scheme would not work. The conspiracy required members like Allen who were willing to enter retail mobile phone stores and convince employees to switch the victims' service. Defendant participated in at least five of these SIM swapping episodes. As described in the Victim Impact Statement submitted by victim T.A., these offenses had significant personal and financial consequences for the individuals who were targeted.

It is true, however, that Allen participated in the conspiracy for a limited time, played a small, if important, role, and received a relatively minor financial benefit. The Guidelines offense level and resulting sentencing range already reflect that, in that the loss amount is based only on the charged activity involving Cytek and M.E. A sentence at the low end of the Guidelines range thus accounts for the nature and circumstances of the offense. 18 U.S.C. § 3553(a)(1).

**B. The History and Characteristics of the Defendant**

Defendant has one criminal history point. This lack of significant criminal history is, however, already a significant factor in the calculation of the appropriate sentence  and should not provide further basis for downward variance. *See United States v. Robinson,* 669 F.3d 767, 777 (6th Cir. 2012) (noting that "[t]he sentencing guidelines already take into consideration [defendant's] lack of significant criminal history); *United States v. Myers,* 439 F.3d 415, 418 (8th Cir. 2006) (finding that a significant downward departure based merely on a lack of criminal history would be unreasonable).

Moreover, any discussion of defendant's criminal history should also note that he participated in an ongoing conspiracy, not just a single incident. His role in the offense required him to travel to other states to impersonate victims. This crime was therefore not a momentary lapse of judgment but required planning and follow-through. The government has similarly accounted for defendant's other history and characteristics in recommending a sentence at the low end of the applicable Guidelines range. 18 U.S.C. § 3553(a)(1)

**C. The Need for the Sentence to Reflect the Seriousness of the Offense, Promote Respect for the Law, and Provide Just Punishment for the Offense**

"The § 3553(a)(2)(A) consideration is the 'just deserts' concept, which carries the need for retribution, the need to make the punishment fit the crime, and the need not just to punish but to punish justly." *United States v. Irey*, 612 F.3d 1160, 1206 (11th Cir. 2010) (rejecting below-guidelines sentence as substantively unreasonable). A sentence including five months of custody would reflect the seriousness of the defendant's conduct, promote respect for the law, and provide just punishment for the offense. The Probation Office has recommended a sentence of time served. Defendant Allen was arrested and released the same day. A time-served sentence in this case therefore results in no custody time at all.

U.S. SENT. MEMO
CR 24-566 JST

5

**D. The Need for the Sentence to Afford Adequate Deterrence**

18 U.S.C. § 3553(a)(2)(B) requires that a sentencing court evaluate both specific deterrence (to defendant) and general deterrence (to other potential criminals). *See United States v. Musgrave*, 761 F.3d 602 (6th Cir. 2014) (rejecting below-guidelines sentence as substantively unreasonable).[3] A sentence involving some custody time would serve as an important deterrent not only to defendant but also to other individuals who might otherwise think that SIM swapping is a minor, victimless crime.

With regard to defendant, as noted in the PSR, defendant Allen has accepted responsibility and expressed remorse for his conduct. He has also agreed to pay restitution to Cytek. These factors merit a sentence at the low end of the Guidelines range.

As to broader deterrence, the Court's evaluation of this sentencing factor should focus on ensuring that others know and consider that they risk federal custody before embarking on similar conduct. *See United States v. Martin,* 455 F.3d 1227 (11th Cir. 2006) (noting that general deterrence is particularly important in white collar crimes and rejecting sentence in part because it failed to provide deterrence); *see also* S. REP. 98-225, 76, 1984 U.S.C.C.A.N. 3182, 3259 ("the second purpose of sentencing is to deter others from committing the offense"). A custodial sentence reflects the crucial role that SIM swapping plays in enabling online crime and could serve as a deterrent to others joining similar conspiracies.

**E. The Need to Avoid Unwarranted Sentence Disparities Among Defendants with Similar Records Who Have Been Found Guilty of Similar Conduct.**

As discussed above, the defendant's lack of significant criminal history is already reflected in his Guidelines sentencing range. Relying on this factor to justify a downward variance would contravene the goal of 18 U.S.C. § 3553(a)(6), which is to avoid unwarranted sentencing disparities. *See United States v. Bistline,* 665 F.3d 758, 767 (6th Cir. 2012) (noting that "[t]he sentencing guidelines already take account of [the defendant's] lack of a prior criminal record and specific conduct" and finding that a

---

[3] Some courts have concluded that the analysis under 18 U.S.C. § 3553(a)(2)(B) should focus on general deterrence, leaving the specific deterrence analysis for consideration under 18 U.S.C. § 3553(a)(2)(C) ("protect the public from further crimes of the defendant"). *See United States v. Edwards,* 595 F.3d 1004, 1021 (9th Cir. 2010) (Bea, C.J., concurring in part and dissenting in part). Either way, it is clear that this Court should consider general deterrence, in addition to the other sentencing factors, in fashioning an appropriate sentence.

U.S. SENT. MEMO
CR 24-566 JST

6

significant downward variance based on lack of criminal history cannot avoid unwarranted sentencing disparities). In addition, there remain other defendants in this case. A sentence at the low end of the applicable range will further the goal of consistency between similarly-situated federal defendants. *See United States v. Ringgold,* 571 F.3d 948, 951 (9th Cir. 2009).

### FINE AND RESTITUTION

The PSR concludes that defendant does not have the ability to pay a fine. PSR ¶ 70-71. The government agrees with the recommendation that the Court not include a fine in defendant's sentence.

The Mandatory Victim Restitution Act ("MVRA") states that courts "shall order" those convicted of certain crimes to "make restitution" to their victims. 18 U.S.C. § 3663A(a)(1). The Ninth Circuit has interpreted the MVRA to mean that those convicted of applicable crimes must pay restitution to any victim "directly and proximately harmed as a result of the commission of [the] offense." *United States v. Waknine*, 543 F.3d 546, 555 (9th Cir. 2008) (citing section 3663A(a)(2)). The MVRA goes on to state that restitution orders "shall require" convicted defendants to pay restitution for offenses "resulting in damage to or loss or destruction of property of the victim," 18 U.S.C. § 3663A(b)(1), and to "reimburse the victim for lost income . . . and other expenses incurred during participation in the investigation or prosecution of the offense or attendance at proceedings related to the offense." *Id.* § 3663A(b)(4).

Defendant and the government have agreed to not less than $132,000 in restitution, which includes the money that Cytek spent responding to the extortion demands that we enabled by defendant's offense. The Probation Office agrees with the restitution award, which fairly compensates Cytek for the expenses it incurred to respond to and mitigate defendant's crime.

### CONCLUSION

In full consideration of the defendant's history and characteristics together with the other goals of sentencing, the government respectfully requests that the Court sentence defendant to five months of imprisonment and five months of home confinement, followed by three years of supervised release with

//

the conditions agreed to in the plea agreement and the other conditions recommended by the Probation Officer,[4] $132,000 in restitution to Cytek Biosciences, Inc., and the required $100 special assessment.

Dated: February 20, 2026                                         Respectfully submitted,

                                                                CRAIG H. MISSAKIAN
                                                                United States Attorney


                                                                _____/s/_____
                                                                MICHELLE J. KANE
                                                                Assistant United States Attorney

---

[4] Defendant's use of computers (which include mobile phones) in committing the offense and the likelihood of his continued possession and use of a mobile phone for everyday purposes provides the nexus between computer use and the sentencing goals listed 18 U.S.C. § 3553(a)(2)(B), (a)(2)(C), or (a)(2)(D) justifying imposition of the search clause agreed to by defendant in the Plea Agreement. *See United States v. Bare*, 806 F.3d 1011, 1017 (9th Cir. 2015) (upholding search clause where District Court made factual finding of nexus between defendant's potential computer use on supervised release and the need to deter future criminal conduct).

U.S. SENT. MEMO                                    8
CR 24-566 JST